## Attorney General *vs.* City of Cambridge.

A statute authorizing county commissioners to lay out as a public highway a bridge origi-
nally established by the legislature over a navigable stream, and used as a public way
for two hundred years, during which period the legislature has from time to time
imposed upon various towns the expense of keeping the bridge in repair, and
releasing from their obligation some of the towns upon which the duty and expense of
maintaining it has been imposed by previous statutes, is constitutional; and leaves it
the duty of the towns not released to maintain the bridge until the exercise by the
county commissioners of the authority conferred upon them, even after their refusal,
upon petition, to lay out the bridge as a public highway.

The *St.* of 1860, *c.* 95, releasing the towns of Lexington and West Cambridge from the
obligation of contributing to the expense of maintaining the Great Bridge between
Cambridge and Brighton, and of repairing and tending the draw, imposed upon them by
earlier statutes, is constitutional; and imposes upon Cambridge and Brighton the whole
duty and expense of maintaining, repairing and tending the bridge and draw, until the
county commissioners lay out the bridge as a public highway.

The resolve of May 4th 1781, "that the towns of Cambridge and Lexington be at the
whole expense of repairing said bridge, until the grants made said towns by the general
court be wholly expended," did not release those towns from the obligation to repair
the bridge after the expenditure of the fund granted.

Information in equity by the attorney general, at the rela-
tion of Emery Willard of Brighton, in behalf of himself and
other inhabitants of the county of Middlesex, to restrain the
city of Cambridge from raising and keeping raised the draw in
the Great Bridge over Charles River between Brighton and
Cambridge, and from closing and obstructing the avenues lead-
ing to the bridge, and removing the planking of the draw, to
the public damage and nuisance of all the inhabitants of the
Commonwealth, and particularly of the relator and other per-
sons residing near the bridge.

An answer was filed, which was demurred to, and by which,
in addition to the facts stated in the opinion, it appeared that
the county commissioners of Middlesex, upon the petition of
the city of Cambridge to lay out the bridge as a public high-
way, had adjudicated that the common convenience and neces-
sity did not require that it should be so laid out.

*Hoar,* J. granted a temporary injunction, and reserved the
case for the decision of the full court.

*J. P. Converse & W. W. Warren,* for the informant and relators.
*E. Washburn,* for the respondents.

CHAPMAN, J. The respondents are right in their position that if they are not bound to support or repair the bridge, and if it was unsafe for travel, they ought to shut up the avenues to it, and prevent its use as a public highway. They contend that they are released from all obligation to support it by the *St.* of 1860, *c.* 95. That act contains two provisions. The first releases Lexington and West Cambridge from all obligation to contribute towards its support; and the second authorizes the county commissioners to lay it out as a highway. The respondents liken the first provision to the release of one of two joint obligors in a bond, the effect of which is to release the other also. This involves the idea that the obligation of Cambridge to maintain the bridge is founded in contract; and if this idea were correct, there might be some reason for saying that the release of two of the towns liable to contribute towards its maintenance released the other two. It must in such case be left to go to decay, for want of any provision for its support. It is obvious that if the legislature had intended this, a much more direct method would have been to discontinue it in terms. And if they intended to release all the four towns, they took great pains to make their intention obscure.

But we do not regard the obligation as having ever been founded in any contract, express or implied. On the contrary, we think it originated in the authority of the legislature to exercise its discretion in the distribution of public burdens. We think such authority has been exercised from time to time, ever since the erection of the bridge, in providing for its support; and that the act of 1860 is, in this respect, of a character similar to others which have preceded it.

The authority of the legislature to pass special laws of such a character has not been questioned in this case; it has been exercised in many instances, and is fully recognized and sustained in *Norwich* v. *County Commissioners,* 13 Pick. 60.

Cambridge originally included a large territory on both sides of Charles River, and has been the parent of several new

towns which have been set off from it. The bridge was originally built within its limits, by authority of the colonial legislature, as stated in the answer, about the year 1660. The town seems to have had the control of the bridge and the responsibility of keeping it in repair; but various legislative grants were made to relieve the town of some portion of the burden.

In 1670 it was authorized to charge tolls upon travellers. In 1684 a grant of £10 per annum was made by the legislature towards the maintenance of the bridge. In 1699 Newton, which had been set off from Cambridge, was charged with one third of its support; and to encourage the rebuilding, which had become necessary, the legislature granted £153, and charged £50 each on Middlesex and Suffolk Counties. In 1700 the burden was again shifted, by dividing it equally between the town of Cambridge and the county of Middlesex. In 1704 the court of sessions ordered Cambridge to repair it. In 1712 Lexington was set off from Cambridge, with an obligation to pay its share for supporting the bridge, according to its valuation. In 1733 the legislature granted £300 for its support. In 1734 they granted three thousand acres of land to Newton, Cambridge and Lexington, for its support.

In 1781 Newton was released from further liability for its support. This release occasioned a suit in favor of Cambridge, which was decided in 1835. *Cambridge* v. *Lexington*, 17 Pick. 222. In that case, neither party contended that the release of Newton operated as a release of the other towns; but Lexington contended that no part of the increased burden should fall upon that town. Cambridge asserted the contrary and prevailed. That case substantially decides this.

It is contended that a resolve of the legislature, passed in 1781, and recently discovered, limited the obligation of Cambridge to support the bridge only while the avails of the three thousand acres of land should last. But we understand the resolve to amount to no more than a declaration that until that fund was expended no further legislative aid ought to be given.

In 1807 Cambridge was again subdivided, Brighton and West Cambridge being carved out of it; and they were re-

quired to bear their proportion of the expense of maintaining the bridge. Both acts of incorporation treat it as a perpetual obligation; not as the result of a legislative contract, but as a legislative apportionment of their share of a public burden.

In 1838 authority was given to individuals to construct a draw; and all the four towns, Cambridge, Lexington, Brighton and West Cambridge, were charged with the new burden of keeping it in repair, and raised for the accommodation of vessels. Certainly no contract authorized such a proceeding.

In 1860 these towns appear to have been supporting the bridge in the following manner: Cambridge, the original municipality, took the control and responsibility of keeping the bridge in repair, its officers exercising their own judgment on the subject. The amount expended was annually ascertained, and each of the other three towns was called upon and paid its proportion.

Thus the bridge had been supported for many years; and so far as can now be ascertained, Cambridge has always had the sole control of the work. But by the process of subdivision, it had become situated between Cambridge and Brighton; and a glance at the map shows that Lexington and West Cambridge, as well as Newton, lay at a considerable distance from it. The act of 1860, which released them from all further obligation to support it, does not appear to have been unreasonable; and if we take the same view of it which this court and the town of Cambridge took of the act of 1781, releasing the town of Newton, the city of Cambridge should now keep the bridge in repair, and collect of Brighton its proportion of the increased expense.

But the bridge is now of a different character from most other bridges and highways in the Commonwealth. It exists by legislative enactment, and not by the laying out of a court of sessions or commissioners; and it is entirely under the control of Cambridge, while Brighton is obliged to contribute to its support. The second section of the act authorizes a change. If the county commissioners shall lay it out as a public highway, not only can they direct the manner of rebuilding it, and assess

a portion of the expense, not exceeding one half, upon the county if they think proper, but the city of Cambridge and the town of Brighton will each take charge of the maintenance of that part which lies within its limits; and it will be hereafter maintained as most other bridges are.

This however seems to be left to the discretion of the county commissioners, with no more than a strong implication that it ought to be done by them. But until they exercise this authority, the bridge remains a public highway, as it has been almost from the first settlement of the Colony, and must be kept in repair by Cambridge, with a claim on Brighton for its proportion of the expense. *Injunction made perpetual.*